# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 00-2772

_____

Vicki Banks,                          *

                                *

          Appellant,                *

                                *     Appeal from the United States

      v.                         *     District Court for the

                                  *     Western District of Missouri.

Larry G. Massanari,[1] Commissioner   *

of Social Security Commission,      *

                                *

          Appellee.              *

_____

Submitted: March 15, 2001
Filed: July 30, 2001

_____

Before HANSEN and HEANEY, Circuit Judges, and BATTEY,[2] District Judge.

_____

HANSEN, Circuit Judge.

_____

[1] Larry G. Massanari has been appointed to serve as Acting Commissioner of Social Security, and is substituted as appellee pursuant to Federal Rule of Appellate Procedure 43(c)(2).

[2] The Honorable Richard H. Battey, United States District Judge for the District of South Dakota, sitting by designation.

Vicki Banks appeals the district court's[3] grant of summary judgment to the Social Security Administration, affirming the Commissioner's denial of disability insurance benefits and supplemental security income benefits. We affirm.

I.

Vicki Banks was born on July 30, 1957. She has been blind in her left eye since she was involved in an auto accident as a baby. The accident also fractured her skull, requiring drainage of a subdural hematoma, which was successfully treated. Banks attended school through the eleventh grade. She was enrolled in special education classes throughout her schooling, where she had problems in all subjects. She began working as a janitor during her junior year in high school and kept that job for eight years until 1982. She had no significant work history from 1982 until 1988, when she again began working as a janitor. She was laid off from that job on April 30, 1995, her alleged disability onset date.

Banks used heroin for approximately 20 years, reflected in the record as a history of opioid dependence. Banks told one psychologist that she was laid off because of her drug use. The opioid dependance is now in remission, and Banks has been drug-free since July 1996 when she began group therapy and daily methadone treatments. She still attends the group sessions and receives daily methadone treatments.

Banks applied for disability benefits and supplemental security income benefits on September 4, 1996. Banks complained of pain in her right hand at her September 25, 1996, disability examination, which was diagnosed as mild carpel tunnel syndrome (CTS) on October 8, 1996. She has never been treated for CTS or been restricted from

---

[3]The Honorable William A. Knox, United States Magistrate Judge for the Western District of Missouri, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

any activity because of that diagnosis, however.  Banks also complained of headaches during the disability examination.  She again complained of headaches during an examination on November 15, 1996, at which time she received a 5-day prescription for Propranolol.  It is unclear from the record how long Banks took Propranolol for her headaches.  According to her outpatient psychiatric records, she was apparently taking it in January 1997, and she listed it as a medication she was currently taking when she completed her application for hearing dated June 13, 1997.  She did not mention Propranolol at the administrative hearing, however, stating only that she took Tylenol for her headaches, which sometimes alleviated her pain.[4]

Banks sought psychiatric treatment for depression between January and April 1997 and was placed on antidepressants in February 1997.  Banks reported to two different doctors, in April and June 1997, that the medications improved her depression symptoms.  She also reported that the medications permitted her to sleep better and allowed her to be involved in her church.

The Social Security Administration sent Banks to Dr. Paxton Small for psychological testing and a Wechsler Adult Intelligence Scale-Revised (WAIS-R), or IQ, examination on November 15, 1996.  Banks scored 66 on the Verbal portion, 66 on the Performance portion, and 64 on the Full Scale portion of the test.  Although Dr. Small diagnosed Banks in the "Mild Range of Mental Retardation" based on these scores, he noted that "[s]he probably function[ed] at the low level of the Borderline Range of Intellectual Functioning."  (R. at 172.)  Dr. Small thought that the "IQ scores [were] probably somewhat depressed because of her lack of motivation and agitated depression."  (Id.)  He also noted that she was unable to reliably repeat the alphabet or count backwards from 20.

---

[4]Likewise, Banks does not even mention in her briefs the use of Propranolol for her headaches, but argues only that "[s]he takes tylenol for relief [from her headaches], but it is often ineffective."  (Appellant Br. at 6.)

Banks underwent a second psychological examination on April 7, 1997, with Dr. Gregory Sisk, again taking the WAIS-R. She received the same overall scores as on the IQ test performed by Dr. Small, although the subscores were somewhat different. Banks reported to Dr. Sisk that she had been depressed all of her life and that the antidepressants helped her moods. Like Dr. Small, Dr. Sisk diagnosed Banks with Mild Mental Retardation, but commented that she "does not appear limited intellectually when she is engaged in conversation" and that her quickness to give up may have produced scores that underestimated her true abilities. (R. at 193.) Dr. Sisk also noted that Banks' subscores were all well below average and consistent with her placement in special education throughout school. Dr. Sisk observed that Banks had "spent much of her recent time trying to convince others that she is disabled . . . and [that] she may be more interested in proving that she cannot work than she is in actually obtain[ing] training and a job." (Id. at 194.)

Banks was initially denied disability benefits and supplemental security income benefits on October 6, 1996, and again on reconsideration on December 5, 1996, following Dr. Small's examination. Banks then sought a hearing before an administrative law judge (ALJ). Following the hearing, the ALJ propounded interrogatories to a vocational expert (VE), who opined that Banks could not perform her prior job or any other job in the national economy. The ALJ rendered his decision on December 5, 1997, and determined that Banks was not under a disability because she did not meet a listed impairment under the regulations and that she could return to her former occupation as a janitor. The ALJ rejected Banks' IQ scores as invalid and, in so doing, found that Banks did not meet the listed impairment at § 12.05(C) for mental retardation. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C) (1996). The ALJ rejected the VE's opinion because the ALJ believed the VE assumed functional limitations secondary to Banks' borderline intellectual functioning, which the ALJ did not feel were supported by Banks' actual limitations and abilities. The Appeals Council declined to review the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. Banks sought further review in the district court, which

4

affirmed the ALJ's decision, including the finding that the IQ scores were invalid. The district court found alternatively that even if the IQ scores were valid, her other impairments did not meet the second prong of § 12.05(C) and that substantial evidence in the record supported the ALJ's determination that Banks could return to her prior work. Banks appeals.

## II.

Banks argues on appeal that the ALJ's finding that she does not meet the listed impairment for mental retardation is based on improper legal standards and is not supported by substantial evidence, that the district court erred in finding that the ALJ did not have to rely on the VE to determine whether she could perform her prior work, and that the ALJ's finding that she does not have any nonexertional limitations is not supported by substantial evidence. We review de novo the district court's decision to uphold the denial of social security benefits. We must determine whether the ALJ's decision is based on legal error and determine if substantial evidence in the record supports the denial. Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000). Substantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision. Our review ultimately requires us to review the administrative record as a whole, fairly considering the evidence that detracts from the decision as well as the evidence that supports it. Bryant v. Apfel, 141 F.3d 1249, 1251 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 944 (8th Cir. 1997). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, . . . or because we would have decided the case differently." Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).

Under the familiar five-part analysis utilized in social security disability cases, the ALJ must determine, sequentially, the following: 1) whether the claimant is employed; 2) whether the claimant has a severe impairment; 3) whether the impairment

5

meets a listed impairment; 4) whether the impairment prevents the claimant from doing past work; and 5) whether the impairment prevents the claimant from doing any other work. See 20 C.F.R. § 404.1520(a)-(f) (1996). If the claimant fails at any step, the ALJ need not continue. The claimant carries the burden of establishing that she is unable to perform her past relevant work, i.e., through step four, at which time the burden shifts to the Commissioner to establish that she maintains the residual functional capacity to perform a significant number of jobs within the national economy. See Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). The ALJ determined that Banks met the first two steps. It is at step three that Banks first takes issue with the ALJ's findings.

A.

If the ALJ finds that the claimant meets a listed impairment at step three, the ALJ must make a finding of disability. See 20 C.F.R. § 404.1520(d). The relevant listed impairment in this case is § 12.05, mental retardation. See 20 C.F.R. Pt. 404, Subpt. P, App. 1. Mental retardation is "a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)." Id. § 12.05. The required level of severity is met if the following relevant conditions are found: (a) a valid IQ between 60 and 70, and (b) "a physical or other mental impairment imposing additional and significant work-related limitation of function." Id. § 12.05(C). The ALJ found the first prong unmet because he found that Banks' IQ scores were invalid based on Dr. Small's and Dr. Sisk's comments. The district court found substantial evidence to support that conclusion, and went on to hold that even if the IQ scores were valid, the second prong was not met because the additional alleged disabilities did not significantly limit Banks' ability to work.

Banks first argues that the district court erred by reaching for and making the alternative finding that she had no additional and significant work-related limitations.

"[A] reviewing court may not uphold an agency decision based on reasons not articulated by the agency," when "the agency [has] fail[ed] to make a necessary determination of fact or policy" upon which the court's alternative basis is premised. Healtheast Bethesda Lutheran Hosp. and Rehab. Ctr. v. Shalala, 164 F.3d 415, 418 (8th Cir. 1998) (discussing the limitations on the rule made by the Supreme Court in S.E.C. v. Chenery Corp., 318 U.S. 80 (1943)). Our review of the ALJ's decision, in which he analyzed each of Banks' alleged disabilities, reveals that the ALJ did in fact make the factual findings necessary for the district court's alternative holding. Thus, the general limitation on a reviewing court's ability to use reasons not utilized by the agency is not applicable to this case.

Relying on Cook v. Bowen, 797 F.2d 687, 690-91 (8th Cir. 1986), Banks argues alternatively that because the ALJ found that her impairments were severe at step two, she has met the second prong of § 12.05(C) as a matter of law. A closer look at Cook and the cases that follow it reveals that this is true only if the finding of severe impairments at step two is based on impairments other than mental retardation. See, e.g., Bryant, 141 F.3d at 1252 (holding that where a severe impairment is found at step two based on a learning disability and migraine headaches, but the headaches posed no more than a slight limitation of function, the second prong of § 12.05(C) was not met). Thus, although the district court found that "[t]he medical evidence on the record supports the ALJ's determination that plaintiff had severe impairments" at step two (Add. at 6), we must look to see what about Banks' combination of impairments made them severe and whether the impairments other than her mental retardation impose additional and significant work-related limitations.

Banks claims that she is additionally limited by depression, headaches, mild carpel tunnel syndrome, blindness in one eye, a history of a childhood skull fracture, and a history of opioid dependence. Based on the factual findings made by the ALJ, the district court found that each of these additional disabilities did not significantly limit Banks' ability to work. We agree. There is no evidence that Banks is limited in

any way by the childhood skull fracture. Banks has been blind since childhood and has successfully worked for years with that condition. Her opioid dependence is in remission and being successfully treated. Banks had each of these conditions while she worked as a janitor. She does not allege that any of them made her unable to perform her prior work; rather, she told Dr. Sisk that she was "let go" because she was strung out on drugs. These alleged limitations are insufficient to satisfy the second prong of § 12.05(C). See Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (noting that the claimant's employment history suggested that her ability to work was not more than slightly affected by her physical impairments); Hinkle v. Apfel, 132 F.3d 1349, 1353 (10th Cir. 1997) (following Eighth Circuit precedent and holding that where there is no evidence that the claimant's condition has deteriorated since he last worked, the second prong of § 12.05(C) was not satisfied); cf. Sird v. Chater, 105 F.3d 401, 402 (8th Cir. 1997) (holding that the second prong of § 12.05(C) was met where the claimant had been "additionally impaired in the period since he performed past relevant work").

Banks' remaining limitations include depression, headaches, and mild carpel tunnel syndrome in her right wrist. She reported to Dr. Sisk that she had been depressed most of her life and that she suffered from a nervous breakdown in 1987 after her father was killed. However, she never sought treatment at that time and worked from 1988 until 1995 at the same job, despite any alleged depression. The record further reveals that to the extent Banks' depression has worsened since she last worked, it is related to dealing with her drug addiction and being drug-free. She stopped taking drugs in July 1996 when she began group therapy and daily methadone treatments. She sought psychiatric treatment in January 1997 related to childhood abuse she had suppressed with her drug addiction. She was prescribed antidepressants in February 1997. She told her psychologist on March 21, 1997, that she was doing well, was attending church and Bible study, and was doing volunteer work by visiting elderly people in a nursing home and working with HIV patients. She reported in April and June 1997 that the drugs were helping her depression. She was terminated as a psychiatric patient in April 1997 because she missed six sessions, and she apparently

8

has never sought further psychiatric treatment. Thus, less than twelve months after taking control of her drug addiction, which apparently precipitated her recent bout of depression, Banks' depression was controlled with medication. Although Banks' attorney asserted during oral argument that Banks' depression is still debilitating and it is unclear whether it is treatable, the citations to the record relied upon to support this argument involve records made prior to the time Banks received the antidepressants.

The only evidence of disabling depression is Banks' statement at the hearing, only a few months after she told doctors she was doing better, that she felt so depressed she did not know if she was going to live. The ALJ discredited her claims of disabling depression as inconsistent with her daily activities, particularly her level of church involvement, and as inconsistent with the her failure to seek additional psychiatric treatment. As noted by the ALJ, Banks' depression improved after she started the antidepressants, and she received treatment for her depression for only three months, missing six of her scheduled appointments during that time. We hold that there is substantial evidence in the record to support the ALJ's factual findings upon which the district court relied to conclude that Banks' depression does not impose significant limitations on her ability to work. See Holland v. Apfel, 153 F.3d 620, 622 (8th Cir. 1998) (holding that lack of evidence of ongoing treatment for depression supported determination that claimant failed to meet the second prong of § 12.05(C)); cf. Gowell v. Apfel, 242 F.3d 793, 798 (8th Cir. 2001) (concluding that failure to seek psychiatric treatment, coupled with extensive work history, supported finding that claimant's alleged depression was not a severe impairment). See also 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A) (requiring limitations based on mental disorders to last, or be expected to last, at least 12 months).

Banks also complains of disabling headaches, which she labels as migraines. Banks characterizes them as lifelong and attributes them to the head injury she suffered as a baby, although no doctor has made that etiological finding. Banks experienced a

brief blackout in 1996 when she fell at church, which she attributed to her headaches. There is no evidence that Banks suffered from any other blackouts. Banks received at least one prescription for Propranolol in November 1996, which is prescribed for migraine headaches, see Physicians' Desk Reference 3307 (53d ed. 1999), though as we noted above, it is unclear from the record how long she took that medication. At the hearing, she testified only that she took Tylenol, which was sometimes effective and sometimes not. No doctor has ever diagnosed a neurological abnormality related to her headaches. The ALJ concluded from his review of the record that Banks' complaints about her headaches, both to medical professionals and at the hearing, were vague and that her failure to follow up on treatment undermined the alleged severity of the headaches. The record evidence supports the ALJ's conclusion that "[t]he evidence simply fails to establish that the claimant's headaches result in any more than a slight, if any[,] limitation in her ability to engage in work-related activities" (Add. at 18) and provides sufficient support for the district court's conclusion that Banks' headaches did not pose a significant restriction on her ability to work. See Buckner, 213 F.3d at 1012 (holding that ALJ's finding of no § 12.05(C) additional and significant impairment was supported by substantial evidence where medical evidence contradicted claimant's complaints of obesity, headaches, dizziness and sore hands).

Banks was diagnosed with mild carpel tunnel syndrome in her right wrist on October 8, 1996, after she last worked. However, she has never been restricted by a doctor or prescribed any treatment for the mild carpel tunnel syndrome. The diagnosing doctor noted that tests showed only "slight delay in digital latency . . . [which] is consistent with mild right carpel tunnel syndrome." (R. at 162.) Banks has not sought further treatment and does not even report taking medication for the pain in her hands. At the administrative hearing, she testified that she gets sharp pains in her hands, that it is hard to use them sometimes, and that sometimes she can hardly write with her left, nondominant hand because of the pain. The ALJ discredited Banks' subjective complaints of pain in her hands, noting that her diagnosis of right carpel tunnel syndrome was mild, surgery had not been recommended, and no doctor had ever

placed restrictions on her activities related to the carpel tunnel syndrome. We conclude that substantial evidence in the record supports the ALJ's fact findings and properly forms the basis for the district court's conclusion that Banks' mild carpel tunnel syndrome is not a significant limitation on her ability to work. See Holland, 153 F.3d at 622 (rejecting § 12.05(C) claim where doctor released claimant to work following wrist surgery although he found twenty percent permanent disability; doctor's only recommendation was to use a wrist lacer when lifting heavy objects); Hinkle, 132 F.3d at 1353 (holding that the second prong of § 12.05(C) was not met despite claimant's back pain because claimant still had a fair tolerance for work-related activities and his doctors noted no restriction in movement).

Having found that none of Banks' alleged impairments meet the second prong of § 12.05(C) individually, we look at whether any of them in combination sufficiently limit Banks' ability to work. As we have noted, Banks worked extensively with all of the alleged impairments to some degree, except possibly the mild carpel tunnel syndrome, which was diagnosed after she last worked. She worked as a janitor for two extended periods of time, first for eight years and most recently for seven years, earning over $10,000 per year during her most recent employment. Her ability to work with these impairments, coupled with evidence that Banks is "more interested in proving that she cannot work than she is in actually obtaining training and a job," (R. at 194), supports the conclusion that none of Banks' impairments significantly restrict her ability to work. See Buckner, 213 F.3d at 1012 ("[A]lthough there may be some evidence that [claimant] suffers from a physical or additional mental impairment that limits her ability to work, . . . [claimant's] employment history . . . suggests that her ability to work is not more than slightly affected by any physical impairments that she may have."). Because we believe none of Banks' impairments, either individually or in combination, rise to the level of significant work-related limitations, we affirm the district court's alternative holding based on the second prong of § 12.05(C). We therefore decline to address the ALJ's finding that Banks' IQ scores were invalid.

B.

Banks next argues that the ALJ was required to rely on the VE's testimony at step four in assessing whether she could return to her prior relevant work because she has nonexertional impairments. We begin by noting that it is clear in our circuit that vocational expert testimony is not required at step four where the claimant retains the burden of proving she cannot perform her prior work. See Gowell, 242 F.3d at 799; Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994). Vocational expert testimony is not required until step five when the burden shifts to the Commissioner, and then only when the claimant has nonexertional impairments, which make use of the medical-vocational guidelines, or "grids," inappropriate. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998); Johnston v. Shalala, 42 F.3d 448, 452 (8th Cir. 1994).

We have stated in passing that "[t]he testimony of a vocational expert is relevant at steps four and five of the Commissioner's sequential analysis . . . ." Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999). We have not required it at step four. In Gilbert, the ALJ determined that the claimant's impairments were not severe at step two, although he sought the testimony of a VE at the hearing. We relied on the VE's testimony that the claimant could not perform prior or any other work, and the ALJ's failure to explain why he rejected the VE's opinion, in reversing and remanding for further consideration. Our concern was with the ALJ's decision to stop the analysis at step two, noting the Social Security Administration's cautionary rulings recommending that analysis should proceed past step two if there is any doubt about the effect of the claimant's impairments on her ability to do basic work activities. See id. at 604-05. We also recognized, however, that an ALJ is free to ultimately find fewer or less severe impairments than included in the hypothetical to the VE. Id. at 604.

In this case, the VE based his conclusion that Banks could not perform any work in the economy, including her past work, on "right dominant hand limitation and job

base erosion due to borderline intellectual functioning and occasional interactions." (R. at 145.) The ALJ rejected the VE's opinion because he believed the VE inappropriately assumed secondary limitations from Banks' borderline intellectual functioning that were not supported by her actual abilities and limitations. The VE assumed limitations in unskilled occupations, which the ALJ found unsupportable as Banks worked for significant periods of time in unskilled positions with borderline intellectual functioning. The ALJ properly disregarded the VE's opinion because it is unclear the extent to which the opinion relied on Banks' borderline intellectual functioning. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) ("Since the vocational expert was basing her opinion upon [claimant's] assertions [regarding depression which the ALJ found unsupported], this portion of the opinion was properly disregarded."). Because the ALJ was not required to utilize the services of a VE to begin with, he did not err in failing to further clarify the VE's opinion by eliciting further testimony from the VE. Like any other proffered evidence, the ALJ is free to accept, in whole, in part, or not at all, the VE's opinion at step four so long as the ALJ explains why the VE's opinion is treated the way the ALJ treats it. See Gilbert, 175 F.3d at 604 (noting that the ALJ's conclusory finding that some of the claimant's alleged impairments were not severe supported his decision to disregard the VE's opinion to the extent it relied on those impairments); see also Barnett v. Apfel, 231 F.3d 687, 690 (10th Cir. 2000) (holding that the ALJ properly rejected VE testimony at step four where the hypothetical included limitations not supported by the record). He did so in this case.

## C.

Banks argues that the ALJ's finding that she did not suffer from any nonexertional impairments is not supported by substantial evidence in the record. Using the factors outlined in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the ALJ determined that Banks' subjective complaints were not credible. Banks does not quibble with any of those findings. Rather, she relies on the fact that the ALJ concluded that she suffered from severe impairments at step two, including borderline

13

intellectual functioning and depression, to leap to the conclusion that she is disabled due to these nonexertional impairments. Severe or not, neither impairment prevented Banks from holding two jobs for extended periods of time. For the reasons discussed at length above regarding the second prong of § 12.05(C), we conclude that substantial evidence in the record supports the ALJ's finding that to the extent Banks suffers from any nonexertional limitations, they do not prevent her from performing her past work as a janitor.

Finally, Banks argues that the ALJ was required to rely on the testimony of a VE because borderline intellectual functioning and depression are nonexertional impairments which must be evaluated by a VE. Because the ALJ found that Banks could perform her prior work as a janitor, a decision we conclude is supported by substantial evidence in the record, the ALJ was not required to rely on the expertise of a VE, even though some of Banks' alleged impairments were nonexertional. (See discussion supra § II.B.) As discussed above, it is only when the claimant satisfies her burden of establishing that her nonexertional impairments prevent her from performing her past work and the burden shifts to the Commissioner that the testimony of a VE is required.

## III.

For the reasons stated above, we affirm the district court's judgment.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. The administrative law judge utterly failed in his responsibility to develop the record fully, to state the evidence accurately and completely, and to follow faithfully the social security regulations and precedents of this court.

Vicki Banks's hearing was held on September 22, 1997. It lasted twenty minutes at most, from 9:00 a.m. to 9:20 a.m. (Admin. Tr. at 35, 45, 52.) After Banks's attorney completed his questioning of her, the ALJ asked Banks no questions and called no additional witnesses. The ALJ's lack of attention to the witnesses' testimony and the record is vividly illustrated by the very first statement in the "Evaluation of Evidence" section of his opinion: that Banks was born on April 30, 1995. (Id. at 16.) The fact is that Banks, a black woman, was born in 1957 and was 39 years old at the time of the disability hearing.

The ALJ accepted Banks's statement in her application for disability benefits that she had been employed by agencies of the United States government from 1988 to 1995. The fact is, however, that Banks was employed by private contractors that did work for the United States government throughout that time. She was employed by the Rehabilitation Institute of Kansas City in 1988 and was paid $8,922. She was employed by Porsha Alexander of America in 1989 and 1990 and was paid $10,080 and $13,317, in those years, respectively. She was employed by George Kim in 1991 and 1993 and received $10,919, and $11,496, respectively. In 1993, she was employed by Kim for part of the year and Riteway Magic Supply Company, Inc. for the rest of the year and earned a total of $13,112. In 1994, Banks was employed by Riteway Magic Supply Company, Inc. and was paid $11,867. In 1995, she was employed by Kelly Services, Inc. of Detroit and earned $3,458, by Riteway Magic Supply and earned $1,419, and by Wootens Enterprises of Kansas City and was paid $5,200. (Id. at 79-80.) What is not clear from the record is whether, during the 1988 to 1995 period, Banks was

participating in the federal program to hire handicapped personnel. If so, she was not working in the competitive economy, and she cannot be said to have been gainfully employed during this period of time. This is an issue that can only be resolved at a hearing. That the ALJ failed to resolve this issue is simply another indication of his lack of attention to the record.[5]

The administrative decision discusses a number of health problems that Banks allegedly had:

> [H]eadaches, depression, a history of heroine [sic] addiction with current methadone treatment, poor sleep and energy, low motivation, blindness in her left eye, nervousness, a tendency to get upset and to feel shaky if someone yells at her, and intermittent pain and pins and needles in her hands.

Id. at 16. Banks has had no income since she was last employed. For a time Banks lived on the streets and more recently has been housed and fed by friends. (Id. at 47.) She does not even receive food stamps.

The record also reveals that Banks was involved in a serious automobile accident when she was only three months old when she lost the use of her left eye and has remained totally blind in that eye ever since. A scar runs from the front to the back of her head, and she has suffered from headaches most of her life. Banks was sexually abused by her father and was introduced to heroin by him at age 14. (Id. at 48.) This addiction lasted until Banks was introduced to a methadone program. She has continued in this program until the date of the hearing.

---

[5]The ALJ states that "[t]he claimant's work history is somewhat lacking in continuity which reflects she has not been consistently motivated to work." (Id. at 17.) This statement is belied by the record. From 1988 to mid 1995, Banks consistently worked as a custodial employee, albeit for different employers who apparently were the successful bidders to do the custodial work for the United States government.

The ALJ discusses at some length the claimant's medical reports from the Truman Medical Center. The reports of this center are set forth on pages 207-225 of the administrative transcript. I have made a conscientious effort to read these records in an attempt to determine whether the ALJ fairly set forth the claimant's medical history. Unfortunately, the records are illegible, particularly pages 207-212 of the administrative transcript where the pertinent information appears to be set forth. If I am unable to read them, I doubt that the ALJ had any greater success. This is one more reason why this case should, at a minimum, be remanded to the ALJ for further hearing at which time he could request that the Truman Medical Center prepare readable copies of its records.

Whatever the status of the medical history, Banks is entitled to a finding of disability pursuant to 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05(C), because she has a "valid verbal, performance, or full-scale IQ score between 60 and 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." As to the first prong, Banks received a psychological evaluation by Dr. Small and Dr. Sisk. Both doctors tested Banks and both reached identical results: Banks's scores in both IQ tests were: verbal, 66; performance, 66; and full scale, 64. These scores are within the limits established by the regulations.[6] As to the second prong, Banks clearly met the second requirement of the standard by virtue of the fact that she is blind in one eye. It cannot be denied that blindness in one eye is a physical impairment, which imposes additional and significant work-related limitations of function. It is not for the ALJ or this court to read into the regulation language that changes its meaning. In <u>Cook v. Bowen</u>, 797 F.2d 687, 690 (8th Cir. 1986), we held

[6]Faced with the reports of two consultants who found that Banks would be entitled to disability benefits if their findings were accepted, the ALJ summarily found that their results were of questionable validity, a curious decision given that both psychologists reached the same result, hardly coincidental. Certainly the least the ALJ could have done under these circumstances would have been to ask each consultant whether Banks, if motivated, would be expected to score in excess of 70 on all three tests.

17

that the second prong of 12.05(C) is met when a claimant has a physical or additional mental impairment that has a more than slight or minimal effect upon the ability to perform work. In <u>Warren v. Shalala</u>, 29 F.3d 1287, 1291 (8th Cir. 1994), we affirmed that test. The question was again presented to this court in <u>Sird v. Chater</u>, 105 F.3d 401, 403 (8th Cir. 1997), and we again affirmed our holding in <u>Cook</u>.

The ALJ takes the position that because Banks did custodial work at a time when she was blind in her left eye, that she can do that work now. This position, however, is inconsistent with the regulations.

There is an additional reason why Banks meets the requirements of 12.05(C). The ALJ found, and the district court agreed, that Banks had additional severe impairments, which include a depressive disorder and right carpal tunnel syndrome. Notwithstanding this finding, the ALJ found that neither of these conditions was of such significance that they satisfied the requirements of the second prong. I agree that there is not sufficient evidence in the record to support the claimant's view that the carpal tunnel syndrome in the right hand satisfied the second prong, but there was some evidence that the depressive disorder was sufficient for this purpose. Both the psychiatric consultant, Dr. Sisk, to whom Banks had been referred by the appellee, and the claimant's treating physician at the Truman Medical Center assessed Banks' psychological, social, and occupational functioning pursuant to the <u>Diagnostic and Statistical Manual of Mental Disorders</u> 34 (4th ed. 2000) as falling within the GAF (Global Assessment of Functioning) scale of 41-50. This scale is defined as follows:

> Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

<u>Id.</u>

18

Clearly both Banks's treating physician and Dr. Sisk believed she fell within this category, and clearly there is sufficient evidence in the record to support a finding that Banks has a serious impairment in her social, occupational, and school functioning, and reached the point where she was unable to keep a job. If the record was legible, it would be possible to develop their reasons for making this finding. At the very least, an inquiry should have been addressed to both doctors asking them to give their reasons for stating that Banks had a serious impairment, an impairment that, independent of her blindness, would satisfy the second prong of 12.05(C).

The ALJ failed to perform his duties in another manner. Instead of calling a vocational expert to testify as to whether there was work in the national economy that Banks could perform, he submitted a written interrogatory to the expert, together with all medical reports and exhibits. The expert acknowledged reading and understanding the reports and exhibits and gave the following answers to the proposed hypothetical:

12. Assume an individual of the claimant's age, education and work experience. Assume that the claimant has a medically diagnosed history of an early childhood skull fracture that required drainage of a subdural hematoma (but which did not preclude the claimant from working as a custodian at a level of substantial gainful activity for a period years), mild right carpal tunnel syndrome (she is right-handed), blindness in the left eye, borderline intellectual functioning, depression, and a history of opioid dependence with current methadone treatment. As a result of these impairments, the claimant is limited to performing medium work, but she cannot perform a full range of medium work because she cannot continually, repetitively, or frequently flex her right wrist although she can flex her right wrist occasionally, has no depth perception, and is limited to performing unskilled simple, routine and repetitive tasks not involving more than occasional, superficial interaction with co-workers, supervisors, and the general public.

A. With those limitations, could the claimant:

(1) return to any past work? <u>No.</u>

19

. . . .

(3) perform any other substantial gainful activity?

(4) If so, list the occupations, describe the work settings and duties and identify the numbers of occupations existing in the [sic] within a 100 mile radius of Kansas City, Missouri? <u>No.</u>

. . . .

13. Assume that the claimant is limited to performing no more than light work with the [sic] all of the same nonexertional limitations listed above in hypothetical No. 12 above.

A. With those limitations could the claimant:

(1) return to any past work? <u>No.</u>

(2) if so, which work? <u>No.</u>

(3) perform any other substantial gainful activity? <u>No.</u>

(Admin. Tr. at 144-45 (emphasis added)).

Despite this response from the vocational expert, which incorporated all of the available evidence, the ALJ decided to reject the vocational expert's opinion. At the very least the ALJ should have called the vocational expert to testify at the September 22 hearing. If this had been done, Banks's attorney could have questioned the expert.

Instead, the ALJ found that the claimant's activities of daily living were inconsistent with her claim that she was unable to work. Among the activities that he found inconsistent were watching television, visiting friends, and going to church. How many times must we give instructions that these activities do not indicate that a claimant

20

is able to work full time in our competitive economy? In <u>Baumgarten v. Chater</u>, 75 F.3d 366, 369 (8th Cir. 1996), we reiterated that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work," (quoting <u>Hogg v. Shalala</u>, 45 F.3d 276, 278 (8th Cir. 1995)). This standard has correctly been applied by this court in numerous other cases. <u>See</u> <u>Rainey v. Department of Health & Human Servs.</u>, 48 F.3d 292, 293 (8th Cir. 1995), (holding that heating food, visiting relatives, and watching television were "activities we have held are not substantial evidence of the ability to do full-time work."); <u>Kouril v. Bowen</u>, 912 F.2d 971, 976 (8th Cir. 1990) (stating that "[d]isability does not require total incapacity. It requires that an individual be unable to engage in substantial gainful activity."); <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991) (holding that claimant's "ability merely to perform the limited service of pouring coffee or removing the excess plates from a table on an occasional basis does not compel a conclusion that a claimant is capable of performing the full range of sedentary work on a sustained basis."); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989) (stating that claimant's "ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity."); <u>Easter v. Bowen</u>, 867 F.2d 1128, 1130 (8th Cir. 1989) (holding that "[a]n applicant need not be completely bedridden or unable to perform any household chores to be considered disabled.").

The ALJ stated that the claimant admitted to Dr. Sisk "that her reason for seeking psychotherapy was 'to help me get my disability.'" (Admin. Tr. at 21.) The ALJ then stated that "[t]his factor detracts from the credibility of the presentation the claimant made to Dr. Sisk and the conclusions he may have drawn therefrom." (<u>Id</u>. at 21.) After reading Dr. Sisk's report, I cannot agree that Banks's credibility should be discounted because she wanted to obtain the benefits she was entitled to under the law. In the summer of 1996 not only did Banks refer herself to the Kansas City Mental Health Center, but she also referred herself to the Samuel Rogers Health Center for drug treatment. Her purpose was to make every effort to end her heroin addiction by

21

participating in outpatient counseling six days a week from July 1996 to the date of the hearing. At that time Banks had lost her job, she had no siblings or children, she had been denied food stamps, and she was homeless. Her request for social security benefits under these circumstances, which the law permits, is not sufficient to attack her credibility. This is just another example of how this ALJ reached for any theory that could support his predetermined decision to deny benefits to Banks.

The district court cited two cases in support of its view that an ALJ may discount a claimant's complaints if, among other reasons, she appears financially motivated to apply for disability benefits. These two cases are inapposite. In Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996), the testimony of the claimant was properly discredited because he conceded he could find a minimum wage job at anytime, but that he was worried about his future, thus making it clear that he was able to work. Similarly, in Dodd v. Sullivan, 963 F.2d 171, 172 (8th Cir. 1992), the court was simply stating that one of the reasons the ALJ found Dodd's subjective complaints of pain not credible was because he appeared to be financially motivated to qualify for disability benefits, and there was some evidence of malingering, given the lack of medical documentation for his claim. Here, there was no suggestion that Banks was feigning illness; rather her remarks to Dr. Sisk suggest that she was merely attempting to collect the benefits to which she was lawfully entitled.

After carefully reviewing the ALJ's decision, I cannot come to any conclusion but that the ALJ's decision is not supported by substantial evidence. He failed to conduct a full and fair hearing, he rejected the opinions of two psychologists who found that Banks qualified for disability benefits because of her mental retardation, and he did so without making any effort to question them to clarify their views. Further, he ignored the views of the vocational expert, whom he had selected and to whom he had posed a hypothetical question that he had composed, and did so without calling the vocational expert as a witness so that the expert could be questioned. Finally, he ignored Eighth

Circuit precedent when he found that Banks's current activities were inconsistent with her claim of disability.

The bottom line in this case appears to be that the ALJ believed that because Banks had worked as a janitor for the General Services Administration from February 1975 to September 1982 and for the Internal Revenue Service in the same capacity from February 1988 to April 1995 (when her employment was terminated), she was able to resume and continue employment from that date to the date of the hearing in September 1997. If that were his theory, then he should have made that clear to all witnesses and the claimant.

I believe this court has no alternative but to reverse the district court with directions to remand to the Commissioner with directions to award disability benefits to Banks, or in the alternative, to remand to conduct a full and fair hearing and answer all of the questions that are raised by the ALJ's inadequate hearing and decision.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.