# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1764

_____

| | |
|---|---|
| Sandra Miles, | * |
| | * |
| Appellant, | * |
| | * |
| v. | * Appeal from the United States |
| | * District Court for the |
| Jo Anne B. Barnhart, Commissioner | * Eastern District of Missouri |
| of Social Security Administration, | * |
| | * |
| Appellee. | * |

_____

Submitted: November 18, 2003
Filed: July 9, 2004

_____

Before LOKEN, Chief Judge, and McMILLIAN and BEAM, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Sandra Miles appeals from a judgment of the District Court[1] for the Eastern District of Missouri affirming a final decision of the Commissioner of the Social Security Administration denying her application for supplemental security income (SSI) benefits pursuant 42 U.S.C. §§ 1381-1383c. We affirm.

---

[1]The Honorable Rodney Sippel, United States District Judge for the Eastern District of Missouri.

Miles was born in 1957, and has an eleventh grade education, vocational training in microcomputers and work experience as a housekeeper, cook, file clerk, inventory clerk, machine tender, and office cleaner. In March 1997, she filed an application for SSI benefits, alleging a disability beginning in August 1992 due to, among other things, leg and hand problems and arthritis. Medical records indicated that Miles had right carpal tunnel syndrome, cubital tunnel syndrome, arthroscopic surgery to repair a tear of her right knee, and a history of mitral valve prolapse. In 1997, Dr. Loretta Mendoza examined Miles and reported that she had low back pain aggravated by repeated bending and lifting, could not kneel on her right knee, and had a slight decrease in grip strength and tingling of the right hand. However, Dr. Mendoza noted that Miles could sit and stand for prolonged periods, walk for long distances, lift heavy to moderate objects, and had no dexterity problems with her hands.

After her claim was denied initially and on reconsideration, in 1998, Miles appeared before an administrative law judge (ALJ). She testified that she could not work because of pain in her knees, hands, neck, and back. As to her daily activities, she testified that she took care of her three-year-old grandson, who lived with her, along with her teen-aged son and daughter. Miles testified that she cooked and did some housework. After Miles's attorney pointed out that high school records showed that she had an IQ score of 70, the ALJ asked a vocational expert if that score would preclude work in a competitive environment. The expert responded that a person with such a score could perform simple, repetitive tasks.

Miles appealed the denial to the Appeals Council, which vacated the decision and remanded for further development of the record. In particular, the Appeals Council ordered a consultative mental status examination, noting the IQ score of 70. Section 12.05 of the Listing of Impairments provides that a claimant is disabled by mental retardation if he or she has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the

developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, subpt. P, app. 1, § 12.05. As relevant here, a claimant can meet the listing if he or she has "[a] valid verbal, performance, or full scale IQ of 59 or less," id. at § 12.05 (b), or has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. § 12.05(c).

In October 2000, Dr. James Reid, a licensed psychologist, conducted an evaluation. He noted that although Miles had a valid driver's license and had driven herself to the appointment, she appeared "confused and lethargic." Dr. Reid was concerned that Miles was "deliberately exaggerating her symptoms." In the narrative portion of his report, Dr. Reid noted that Miles had no deficits in communication and there was no evidence of thought disturbances, perceptual distortions, or blatant psychosis, opining that her reality content was within normal limits. As to work-related activity, Dr. Reid opined that her social interaction and abilities to relate to others, understand and remember instructions, maintain the attention required to perform simple tasks, and withstand workplace pressures were moderately impaired. On a checklist, Dr. Reid rated her ability to perform many work-related tasks as poor. Because he was concerned about the possibility of malingering, Dr. Reid recommended a more thorough work-up with cognitive and personality testing.

On December 5, 2000, Miles appeared before a different ALJ. She testified that she was disabled because of pain in her hands, legs, knees, back, and neck. She, however, testified that she worked cleaning offices from 10 p.m. to 6:30 a.m. five days a week. She stated her job was going "okay" and that she tried to finish her work, but sometimes took extra breaks because of migraine headaches. In a December 2000 letter, Miles's supervisor stated that she did "good work," but appeared to be in pain, had complained of headaches, and, more than a few times, needed help to complete her work assignments. Miles also testified that in 2000 she had worked as a machine tender, which required her to sit and watch for broken cell

phone switch parts, but was laid off for lack of work, and also had worked as a glass cleaner, but was terminated because she could not move glass panels weighing twenty or more pounds. Miles testified that in 1999 she worked taking inventory eight hours a day two or three days a week, but was laid off because she could not travel to job sites because of car problems. Records indicated that in 1999 she made almost $8,700.00. Miles also testified that in the 1980s she worked for an insurance company doing filing and had worked as a cook and a housekeeper.

As to her daily activities, Miles testified that on work days she went to bed around 7 a.m. and slept until 5 p.m., but sometimes had problems concentrating at work because of lack of sleep. She said her seventeen-year-old son did most of the household chores and that she did not have many social activities. She, however, went to church on Sunday and could sit through a two hour service.

A vocational expert testified at the hearing. The expert characterized Miles's job as an office cleaner as light and unskilled work and as a machine tender as sedentary and unskilled. The ALJ asked the expert if there were jobs available for an individual of the same education and job experience as Miles and who could sit and stand for thirty minutes at a time, walk for twenty-five minutes, lift no more than ten pounds, and who had moderate impairments in social interaction, understanding and remembering instructions, performing simple tasks, and withstanding stresses of a workplace. The expert responded that such an individual could be a machine tender or inventory clerk.

At the end of the hearing Miles's attorney noted that Dr. Reid had recommended cognitive and personality testing and that Miles's last IQ scores were from high school. The ALJ responded that he would order further testing and would keep the record open for the results and for any additional medical reports.

On December 22, 2000, John Yunker, a licensed psychologist, evaluated Miles. After testing, Yunker reported that Miles had a full scale IQ of 59. Yunker believed the score was a valid indicator of her current level of functioning, noting that she was cooperative, but had great difficulty in verbal expression. As to the effect her impairment would have on work-related activities, Yunker opined that she would have marked impairment relating to others because of her difficulty in being understood, marked impairment in understanding, remembering and following instructions due to her low IQ, and marked impairment in performing simple repetitive tasks. On a checklist, Yunker indicated that Miles had limited cognitive functioning, difficulty being understood, and poor verbal expression.

The ALJ denied benefits pursuant to the five-step sequential analysis of 20 C.F.R. § 416.920. He noted that the first step in the analysis required a determination of whether the claimant was engaged in "substantial gainful activity," and that Miles had earned close to $8,700 in 1999 and had worked full-time jobs in 2000. However, the ALJ did not make a finding at step one, but proceeded with the sequential analysis. At step two, he found that the combination of Miles's impairments, including right knee pain, carpal tunnel syndrome, back discomfort, sinus problems, and mild retardation was severe.

At step three, the ALJ found that Miles had not met § 12.05 of the Listing of Impairments. The ALJ discounted the IQ score of 59 as reported by Yunker, noting that although Yunker had stated that Miles had difficulty in communicating, no one else had reported a communication problem and at the hearing Miles was well-oriented and understandable and her vocabulary was consistent with an eleventh grade education. The ALJ also noted that Miles had not attended special education classes, received B grades, and finished a vocational rehabilitation course in computers. Because the narrative portion of Reid's report did not support his checklist assessment of Miles's work-related skills, the ALJ discounted the checklist and noted Miles had not been terminated from a job for lack of mental abilities. The

ALJ concluded that Miles's "educational and vocational history was not consistent with the types of adaptive functioning contemplated by Listing 12.05."

At step four, the ALJ noted that Miles had not been treated regularly by a mental health professional and had not been recently treated for pain, pointing out that although he kept the record open for submission of additional medical records, none were submitted. Reviewing the medical records, the ALJ found that although Miles had physical and mental limitations, she retained the residual functional capacity (RFC) to return to her past relevant work as a machine tender and inventory clerk and thus was not disabled.

Miles sought review in the district court, which referred the case to a magistrate judge for a report and recommendation. The magistrate judge recommended upholding the denial of benefits. The magistrate judge believed that the ALJ had erred by not stopping his analysis at step one of the sequential analysis. The magistrate judge noted that the regulations provide that substantial gainful activity is presumed if a claimant's average earnings are greater than $700.00 a month for the period between July 1999 and December 2000 and that in 1999 Miles had earned over $700.00 a month and thus was not disabled. See 20 C.F.R. § 404.1574(b)(2)(i). The magistrate judge found that the error was harmless, because substantial evidence supported the ALJ's conclusion that Miles had not met the Listing § 12.05 and that she retained the RFC to return to her past relevant work. Although the magistrate judge gave Miles notice that she had ten days to file objections to his report or risk waiver of the right to appeal questions of fact, she did not file objections, and the district court adopted the magistrate judge's report and recommendations. This appeal followed.

**DISCUSSION**

"Generally, our review is limited to determining whether the ALJ's decision is based on a correct view of the law and is supported by substantial evidence on the record as a whole." Hajek v. Shalala, 30 F.3d 89, 91-92 (8th Cir. 1994). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 92. However, "[i]n this particular case, we review factual findings only for plain error, for [Miles] failed to object to the report and recommendation of the magistrate judge, who found that the [Commissioner's] decision was supported by substantial evidence." Id. We will review questions of law de novo. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993).

On appeal, Miles first argues that the ALJ erred in concluding that Miles did not meet or equal the Listing § 12.05 for mental retardation.[2] As noted above, to meet § 12.05, a claimant must show "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested . . . before age 22." Miles argues she meets the Listing because she satisfies subsection (b), which provides a claimant can meet the listing if he or she has a valid IQ score of 59. She asserts that the ALJ erred as a matter of law in discounting Yunker's assessment that her IQ score was 59. It is undisputed that "[t]he Commissioner is not required to accept a claimant's IQ scores . . . and may reject scores that are inconsistent with the record." Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir.1998) (Clark). "Indeed, test results of this sort should be examined to assure consistency with daily activities and behavior." Id. (internal quotation omitted). "It was therefore proper for the ALJ to examine the record in assessing the reliability of [Miles's] scores." Id.

---

[2]Miles's notes because the ALJ did not address step one in the sequential analysis, the magistrate judge erred in determining that Miles was not disabled at step one. See Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001) (internal quotation omitted) ("reviewing court may not uphold an agency decision based on reasons not articulated by the agency").

In light of the record, the ALJ did not err in discrediting the IQ score of 59. In discrediting the score, the ALJ noted that Yunker had reported that Miles had trouble communicating, but that no one else had noted such a problem and at the hearing she was understandable. The ALJ also noted that Miles attended regular classes in high school, received grades of B, completed a vocational training program, passed a driver's license examination, had driven a car, had lived independently, and had never been terminated from a job for lack of mental ability, but had been terminated because of lack of transportation or lack of work. The ALJ especially noted that at the time of the hearing Miles was working five days a week, eight hours a day. See Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (Roberts) (claimant not disabled by mental impairment where he had worked with "cognitive abilities he currently possessed").

Miles's reliance on Bailey v. Apfel, 230 F.3d 1063 (8th Cir. 2000) (Bailey), is misplaced. In that case, we held that an ALJ erred in discounting a claimant's IQ score of 63. However, in Bailey, unlike this case, the claimant's education, daily activities, and work history "did not call into question the validity of the IQ results." Id. at 1065. This court noted that the claimant had attended special education classes, had never lived independently, and had been fired from jobs for being "slow." Id. Contrary to Miles's argument, the ALJ did not err in relying, in part, of on his observation of Miles at the hearing in discounting the IQ score. See Clark, 141 F.3d at 1255 (in discounting IQ scores ALJ partly relied on observation of claimant at hearing).

In the alternative, Miles argues that the ALJ erred in concluding that she did not meet subsection (c) of Listing § 12.05, which provides that a claimant can met the listing if he or she has a valid IQ score of 60 through 70 and another "impairment imposing an additional and significant work-related limitation of function." Even if Yunker's scores are discredited, as to the first prong of subsection (c), she notes that in high school she had a reported IQ score of 70. However, as he rejected the IQ

score of 59, the ALJ also rejected the IQ score of 70. The evidence of Miles's IQ scores in high school appears in a one-page copy of a summary of her high school record. From the years 1968 to 1972, her reported IQ scores were 76 in 1968, 73 and 70 in 1969, 72 in 1972, and an undated score of 74. We note that although the regulations provide that in cases where more than one score is derived from a valid IQ test, an ALJ must choose the lowest score, the regulations do not address which IQ score is the appropriate when multiple tests have been given. See 20 C.F.R. Pt. 404, subpt. P, app.1, § 12.00D(6). We also note that it is difficult to determine the type of IQ test administered and there is no narrative explaining the scores. As he was required to do, the ALJ examined the score in light of the full record and did not err in concluding that Miles's "education and vocational history was not consistent with the types of deficits of adaptive functioning contemplated by Listing 12.05." Because Miles has not met the first prong of § 12.05(c), we do not address her arguments concerning the second prong.

Nor, contrary to Miles's argument, did the ALJ err at step four in assessing her RFC as to her ability to function in the workplace with her mental limitations. Although "[s]ome medical evidence must support the determination of the claimant's RFC, . . . the ALJ is not limited to considering [only the] medical evidence." Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004) (internal quotation omitted). Rather, in assessing RFC, an ALJ must consider all the record evidence. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (McKinney). In this case, the ALJ did not totally discount Reid's and Yunker's assessment of Miles's ability to work. Indeed, the ALJ found that she had moderate impairments and could not perform complex work. However, based on the fact that she had worked and had not been terminated because of work-related mental impairments and at the time of the hearing was working, the ALJ found that Miles had demonstrated the ability to remember simple instructions and make judgments commensurate with the functions of unskilled work. See Banks v. Massanari, 258 F.3d 820, 825 (8th Cir. 2001) (upholding denial of benefits where claimant worked with impairments and had not

been discharged because of impairments but was fired for other reasons); Roberts, 222 F.3d at 469 (upholding denial of benefits where claimant had worked with ?cognitive abilities he currently possesses"). We note that although vocational testimony is not required at step four, the vocational expert testified that given her moderate impairments, Miles could nonetheless return to her past relevant work as a machine tender or inventory clerk. See Lewis v. Barnhart, 353 F.3d 642, 648 (8th Cir. 2003) (although claimant moderately impaired in ability to understand, remember and carry out detailed instructions and maintain attention and concentration for long periods of time, she could return to past relevant work as assembler); McKinney, 228 F.3d at 863 (although claimant could not perform complex work-related tasks, he retained RFC to perform simple, repetitive work).

The ALJ did not err in finding Miles's RFC did not preclude her from returning to past relevant work and therefore was not disabled. Accordingly, we affirm the district court's judgment.

_____