358 F.Supp.2d 847 (2005)
Howard L. BRINEGAR, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.
No. 2:04 CV 7 DDN.
United States District Court, E.D. Missouri, Northern Division.
February 22, 2005.
*848 *849 Karen Kraus Bill, Law Office of Karen Kraus Bill, Columbia, MO, for Plaintiff.
Raymond W. Gruender, III, Jane Rund, Office of U.S. Attorney, St. Louis, MO, for Defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security on the application of plaintiff Howard L. Brinegar for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq. The parties consented to the exercise of plenary jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

I. BACKGROUND
A. Plaintiff's Application and Medical Records
In January 2002, plaintiff filed his application for disability benefits, alleging he became disabled on March 15, 2001, at age 55. Plaintiff states he is unable to engage in substantial, gainful employment due to low back pain and blackout spells. (Tr. 41, 48.)
The record reflects plaintiff's work history spanning from 1972 until 2001. He most recently worked as a farm laborer and tractor driver, from April 1994 until March 2001. From July 1988 to April 1993, plaintiff worked as a dump truck driver. Plaintiff worked as a laborer, picking up metals from May 1985 to July 1988, and tearing down motor vehicle clutches from March 1979 to March 1981. From February 1972 to February 1979, plaintiff worked trimming and cutting down trees. (Tr. 75-81.)
*850 Plaintiff's wages during the relevant fifteen year look-back period are as follows:

1986 6791.98 1994 1591.50
1987 3973.65 1995 2503.52
1988 4900.00 1996 80.00
1989 3823.75 1997 .00
1990 1246.00 1998 10603.50
1991 .00 1999 11225.00
1992 5782.09 2000 9366.33
1993 10851.26 2001 1791.00

(Tr. 51.)
In a February 15, 2002, claimant questionnaire, plaintiff reports twenty-four hour pain in his lower back, exacerbated by certain ways of sitting and standing, and not relieved by applying heat or cold. Plaintiff reports taking no prescription medication for pain, or any other condition. Plaintiff reports his ability to lift, bend, and sit is affected, he can only sleep for two to three hours at a time, and he has to pay close attention to the way he moves. (Tr. 84-85.)
With respect to activities of daily living, plaintiff states he can engage in any "reasonable" chores, with no assistance. Plaintiff reports enjoying participating in sports; however, stated he "can't do a lot of them anymore." Regarding leisure activities and hobbies, plaintiff states he watches the news on television, reads a variety of books, and notes "sports all types" in describing his activities. Plaintiff does not have a current driver's license, and relies on walking or others for his primary modes of transportation. He reports leaving the house daily to go shopping or to see a physician, but states he has difficulty leaving the house due to "lower back pain from sitting to[o] long." (Tr. 85-87.)
In a February 15, 2002, pain questionnaire, plaintiff reports constantly having lower back pain brought on by sitting and standing, but with varying type. Plaintiff states this pain has limited his activities for approximately one year, and requires he pay attention to his body movements. He describes the pain as contained in the lower back, and not radiating to other extremities. Plaintiff takes no pain medication, using a heat pad and an ice pack for relief. (Tr. 83.)
With respect to medical treatment, plaintiff was seen by the Department of Veteran's Affairs (V.A.), on March 23 and April 6, 1999,[1] for a syncope[2] incident in December 1998. A stress ECG was normal, as was additional testing. On September 8, 2000, plaintiff was seen at the VA, by a Dr. Hopkins, for a two week history of low back pain. Plaintiff reported the pain began after lifting "4 walls" at work, and described the pain as feeling like "pins and needles." On examination, plaintiff had muscle tenderness, no spinous tenderness, a negative straight leg raise, and an unremarkable neurological examination. Plaintiff was diagnosed with L4/L5 back strain, and was prescribed Flexeril[3] and Percocet[4] for pain, and physical therapy for back strengthening. (Tr. 97-106.)
On September 15, 2000, plaintiff was seen by physical therapist Erin B. Hicklin. At this session, plaintiff reported worsening low back pain, with symptoms increasing *851 upon sitting, and sometimes when walking. Plaintiff reported pain on examination. He received education on strengthening exercises to do at home, and received "inferential and MHP x20 minutes to the low back and reported feeling better following treatment." Ms. Hicklin opined that plaintiff should do well with home exercises, as he reported improvement after exercising in his session. Plaintiff again saw Ms. Hicklin on October 27, 2000. He reported feeling "a little better," but that he twisted wrong the previous day and re-injured his back. He was fitted with a Zimmer corset, and reported his back felt much better. He was encouraged to continue the home exercise program. On December 1, 2000, plaintiff was seen at the VA by Dr. Hopkins.[5] Provider notes indicate plaintiff's back pain was resolved, but that he had some shoulder pain. (Tr. 107-10.)
On March 12, 2001, plaintiff presented to the VA with a swollen right knee, and pain in the low back (on and off) for one year. During this visit, plaintiff was examined or evaluated by Karen S. Reider, R.N., M.S.N., Clifford Bowens, Jr., M.D., and Mary F. Murphy, M.D. The record shows plaintiff was taking Ibuprofen,[6] Flexeril, and Oxycodone,[7] with no relief. Radiological examination revealed plaintiff had mild degenerative changes in his lower back. He was prescribed a dose of Naprosyn[8] and ice compresses. Radiological examination of plaintiff's right knee was essentially normal. On April 13, 2001, plaintiff was seen at the VA by Kalpana Rao, M.D., for follow-up related to bursitis in his knee. Dr. Rao noted plaintiff's bursitis was "symptomatically better," and his back pain was controlled. (Tr. 112-118.)
On May 25, 2001, plaintiff was seen by Dr. Rao regarding severe lower back pain for one week. Examination revealed plaintiff was tender over the L3/L4 vertebra, exhibited paraspinal spasm, and experienced back pain on hip movement and straight leg raise. Dr. Rao noted x-rays showed mild degenerative changes in plaintiff's lower back, but plaintiff had no neurological signs and symptoms. Dr. Rao discontinued plaintiff's Narpoxen use, and prescribed Ibuprofen and Sulindac.[9] On October 18, 2001, plaintiff again saw Dr. Rao. Examination revealed plaintiff was tender at the L2-L4 level, and had limited hip range of motion due to pain in the back. His strength and range of motion in all other joints was normal, as was his neurological examination. Plaintiff was taking Ranitidine HCL[10] and Sulindac at *852 this visit, and Dr. Rao also prescribed Etodolac[11] and Flexeril for pain. He was diagnosed with bursitis that was symptomatically better, and back pain. (Tr. 119-22.)
On December 28, 2001, plaintiff was seen by David R. Lane, M.D., for fainting spells. Plaintiff reported seeing spots and falling to the ground, and feeling tired afterwards. Witnesses told plaintiff he "flops around like a fish" during these incidents. Examination was essentially normal, and Dr. Lane ordered a chest x-ray, brain MRI, EEG, and Holter monitor. A cat scan of the head was normal. The chest x-ray revealed probable COPD, the Holter monitor showed no arrhythmia, and the brain MRI was essentially normal. (Tr. 124-135.)
Plaintiff saw Dr. Rao on February 7, 2002. At this visit, he complained of left arm pain, without exertion, for approximately two weeks. Dr. Rao noted that all tests related to plaintiff's December 2001, syncope incidents were normal, with EEG results pending. (Tr. 167-68.)
On March 7, 2002, plaintiff saw Dr. Rao. Dr. Rao noted plaintiff had no new complaints, and that back pain was stable, with no neurological signs and symptoms. Plaintiff reported that some days he is able to sleep without waking up due to back pain. Plaintiff's left arm pain was also improved. (Tr. 162-63.)
On March 18, 2002, plaintiff saw Jennifer L.K. Clark, M.D., for an evaluation ordered by SSA. Dr. Clark noted plaintiff has complained of "pins and needles sensation" in his low back, "has been having problems since July 2000," and was taking no medication at the time of the examination. Plaintiff is divorced, with three grown children. He smokes one pack of cigarettes per day, drinks alcohol on occasion, and engages in "lots of walking for exercise." Plaintiff reported he feels better when he lays down and uses heat, and worse when bending over and doing a lot of lifting. Dr. Clark reported that plaintiff said he can stand for four to five hours, walk one mile, and sit for approximately 15-30 minutes. (Tr. 136.)
Reviewing plaintiff's medical records, Dr. Clark noted radiological reports indicated mild anterior lipping. Dr. Clark found all other medical records and testing were essentially normal. Plaintiff also indicated some pain in his left arm, radiating from his neck. Dr. Clark acknowledged plaintiff's blackout in December 2001, and that he has had no additional instances. (Tr. 137.)
Dr. Clark observed plaintiff walk with a normal gait to and from x-ray; however, "when asked to ambulate, he will kind [of] limp around on both feet." Neurological and skeletal examination was unremarkable. Plaintiff had a full range of motion, but his neck "is a little tight in bending bilaterally...." Plaintiff has tenderness in the spine from T12-L4, which appears worse with stretching. His straight-leg raise was negative, he is able to walk on toes and heels, he can squat without difficulty, and his balance is good. (Tr. 137-38.)
Ultimately, Dr. Clark assessed plaintiff had nicotine addiction, back pain with no objective findings, and dizzy spells with etiology unknown. She found plaintiff had no restrictions with respect to "hearing, speaking, traveling, lifting, carrying, handling *853 objects, sitting, and walking." (Tr. 138.)
On June 13, 2002, plaintiff saw Dr. Rao. At this visit, Dr. Rao noted plaintiff's knee pain had improved, arm pain was better, and that his back pain was stable. Dr. Rao ordered an MRI of the back, because plaintiff had severe pain at times. Plaintiff underwent an MRI of the lumbar spine on July 3, 2002. The study showed mild degenerative disc changes, and degenerative end plate changes, with mild bony edema. On July 22, 2002, plaintiff saw Dr. Rao for severe back pain. Dr. Rao noted plaintiff had no new neurological signs and symptoms, and that plaintiff's back MRI was negative, knee pain had improved, and arm pain had increased. Dr. Rao prescribed Flexeril and Etodolac for pain control. (Tr. 157-61, 175.)
On August 16, 2002, plaintiff saw Dr. Rao for continued arm pain. He reported arm pain at least three times per week, without numbness, tingling, and weakness. Dr. Rao's impression was that plaintiff had upper arm pain without any neurological signs and symptoms. An x-ray of the c-spine revealed cervical spondylosis with moderately severe neural foraminal narrowing, and no acute bony abnormalities. (Tr. 152-53, 173.)
A September 10, 2002, MRI showed plaintiff had degenerative discs, joint changes at multiple levels, mild to moderate canal narrowing at C5-6, mild at C3-4 and minimal at C4-5 and C6-7 levels. Plaintiff also had moderate narrowing of left C3-4 and left C6-7, bilateral mild to moderate narrowing of C5-6, mild narrowing of right C3-4, left C4-5, and right C6-7. An EMG showed C6 radiculopathy. (Tr. 148, 172.)
On February 20, 2003, plaintiff was seen for high cholesterol, and reported continued left arm and neck pain. Plaintiff had no new back signs and symptoms, and Dr. Rao noted a recent MRI of the back was negative. Plaintiff continued to take Ranitidine HCL and Etodolac. (Tr. 146-47.)
On April 2, 2003, plaintiff saw Amy Stenehjem, M.D., for left arm pain. Plaintiff reported numbness and tingling in his arm, worsening with rotary movement. Dr. Stenehjem noted an MRI of the c-spine evidenced
1. Mild to moderate central canal narrowing at C5-6, mild at C3-4 and minimal at C4-5 and C6-7 levels due to adjacent disc & end plate disease.
2. Moderate narrowing of the left C3-4 & left C6-7, bilateral mild to moderate narrowing of C5-6 and mild narrowing of the right C3-4, left C4-5 and right C6-7 neural foraminal levels.
Dr. Stenehjem indicated that plaintiff could "be managed with PT, traction and TENS." An x-ray of the left shoulder showed "minimal hypertrophic change is present at the inferior aspect of the AC joint. The significance of this is uncertain." (Tr. 144-45, 169.)
On April 4, 2003, Alexandra Lewis, P.T., was consulted in plaintiff's treatment. Ms. Lewis noted plaintiff has "[c]ervical spondylosis with moderate to severe neural foraminal narrowing on left at C3-4. There is disc narrowing in multiple levels. His pain and radicular symptoms have been present for about a year. He says he has constant pain. It wakes him frequently at night." Plaintiff had limited range of motion in the cervical spine. Ms. Lewis treated plaintiff with intermittent traction, and he was given home exercises to increase spinal range of motion. Plaintiff reported less pain following treatment. On, April 18, 2003, plaintiff saw Ms. Lewis for physical therapy. He reported no change in his neck and upper trapezius. He was treated with ultrasound and intermittent cervical traction, and reported feeling better after treatment. (Tr. 141-43.)
*854 B. Plaintiff's Hearing Testimony
The ALJ conducted a hearing on June 10, 2003, at which plaintiff was represented by counsel. Plaintiff testified he completed school through the twelfth grade, with no additional technical or special training since graduation. Plaintiff testified his past employment included work as a laborer and a truck driver. With respect to truck driving, plaintiff testified that he can no longer engage in this type of employment, because he cannot stay seated for extended period without pain in his lower back, and his back pain is exacerbated by road conditions. Moreover, he testified that his work as a truck driver involved lifting items, including "[d]rywall, two by fours, the lumber, tarps, tires, just about anything a truck driver can have to load." (Tr. 32-33.)
Regarding his medical condition and treatment, plaintiff testified that he receives treatment at a V.A. Facility, and that SSA sent him for an examination by Dr. Clark. With respect to this examination, plaintiff testified he felt it was not thorough, and disputed Dr. Clark's report stating he told her he was able to stand four to five hours a day. Plaintiff testified he is only able to sit and stand for approximately thirty to forty-five minutes at a time. After that point, he experiences numbness in his legs, numbness and pain in his lower back, and feels like he is "going to pass out or black out." Plaintiff testified he had a few blackouts in 2001 and fell. Plaintiff does not know what is causing these blackouts, but says they occur when he's "not watching really what I'm doing real close," including when he stands up quickly or is sitting. (Tr. 34-37.)
Plaintiff further testified he has pain in his neck, exacerbated by right and left head movements, arm movement, and with bending. Plaintiff testified his back pain is continuous and is anywhere from a five to an eight on a one to ten pain scale. Due to his back pain, plaintiff testified that he only sleeps a few hours through the night, naps a few hours a day, uses hot and cold compresses, and takes medication. Additionally, plaintiff testified he experiences headaches "every couple of weeks," with unknown etiology. For headache treatment, plaintiff testified he takes aspirin and lays down for at least a couple of hours. (Tr. 35-36.)
With respect to activities of daily living, plaintiff testified he spends much of his day "loafing" or doing "odd jobs." When questioned on the longest period of time he could be "up" in a day, plaintiff testified that he could be up "at least a couple or three  a couple of hours. Maybe 30 minutes to an hour. And then I got to lay back down. The same with my headaches." Plaintiff testified he is no longer able to engage in hobbies he once enjoyed. He cannot bowl because he cannot bend with a sixteen pound ball, and he is afraid to hunt and fish "because if you hook a big fish, then you got to fight the fish. And so that's kind of out of my  and then you're carrying a gun, and you can't hunt." (Tr. 37-38.)
C. Medical Evidence Received Subsequent to Disability Hearing
On June 21, 2003, plaintiff was seen for severe back pain radiating down the front of his legs. Upon examination, plaintiff's movements were slow and hesitant. Plaintiff reported feeling like his legs were numb. Plaintiff was given a Toradol[12] injection, and advised to remain on bed rest for three to four days and not lift *855 more than fifteen pounds. A record of this visit was first made part of the record by the Appeals Council. (Tr. 9, 202-04.)
On August 13, 2003, plaintiff was assessed by Gregory K. Ivins, M.D., at the ALJ's request. Dr. Ivins detailed plaintiff's medical history and conducted an examination. Examination revealed plaintiff has decreased range of motion in the neck. With respect to the back, plaintiff has a "[s]light scoliotic curve, generalized stiffness and decreased ROM, no significant spasm noted. SI joints tender bilaterally but sciatic notches are not tender. He can flex 70 [degrees]." Plaintiff's left shoulder has decreased range of motion, with his right shoulder normal, and he has stiff hips with mild decreased range of motion. There is no indication plaintiff continues to have a right knee mass. Dr. Ivins's impressions were that plaintiff has "(1) [m]oderate cervical spine DJD with neural foraminal narrowing at multiple levels, (2)[m]ild lumbar spine DJD with no evidence of nerve root entrapment, (3)[l]eft shoulder rotator cuff syndrome, (4)[h]istory of significant tobacco abuse with emphysema." (Tr. 178-79.)
Dr. Ivins completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)." He found plaintiff can lift fifty pounds occasionally, twenty pounds frequently, stand at least two hours in an eight-hour day, and can sit without restriction. Plaintiff is further limited to pushing and pulling fifty pounds in both the upper and lower extremities. With respect to postural limitations, plaintiff is able to climb, balance, kneel, crouch, crawl, and stoop occasionally. Plaintiff is limited to reaching only occasionally, but he is unlimited regarding handling, fingering, and feeling. Plaintiff has no limitations with respect to seeing, hearing and speaking, and with exposure to temperature extremes, noise, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals, and gases. (Tr. 181-84.)
On September 8, 2003, plaintiff saw David W. Burlock, M.D., for evaluation of back pain, which had worsened over the two months preceding examination. Plaintiff reported only getting two hours of sleep per night, due to pain, and instances where the pain radiated down his legs. Plaintiff was diagnosed with low back pain with muscle spasm, and somatic dysfunction. He was injected with Lidocaine[13] for pain relief. A radiological examination of the spine was essentially unchanged since one completed in March 2001. A record of this visit was first made part of the record by the Appeals Council. (Tr. 9, 187, 190-91.)
Plaintiff saw Dr. Rao on September 27, 2003, for follow-up for high cholesterol. At this visit, plaintiff reported low back pain and stiffness, and taking Etodolac, Ranitidine HCL, and Simvastatin.[14] Dr. Rao noted that plaintiff's MRI was negative, and his back pain was "fairly controlled with [E]todolac." It does not appear that this record was submitted to the Appeals Council and, given it post-dates records introduced for the first time to the council, it is unknown whether the ALJ considered it in making his determination. (Tr. 192-95.)
D. The ALJ's Decision
In an October 16, 2003, decision denying benefits, the ALJ determined plaintiff is *856 not disabled as defined by the Social Security Act. The ALJ noted plaintiff experiences right knee pain and blackouts, but that these impairments are not severe as defined by the Act. He further noted plaintiff has the severe impairments of degenerative disc disease of the spine and left shoulder rotator cuff syndrome, but that these impairments are not severe enough to meet or equal a Listing impairment. (Tr. 15, 17-18.)
Finding a severe impairment, the ALJ determined that plaintiff had the RFC to engage in past, relevant work, concluding
[t]he claimant has the residual functional capacity to perform work-related activities except for lifting or carrying more than 50 pounds occasionally and 25 pounds frequently; standing or walking more than 5 hours in a 6-hour work day; climbing, balancing, stooping, kneeling, crouching or crawling more than occasionally; and reaching overhead with the left upper extremity more than occasionally.
(Tr. 21.)
In doing so, the ALJ referred to medical records, plaintiff's work record, plaintiff's subjective complaints, observations by treating and examining physicians, plaintiff's compliance with treatment, and medical opinions. With respect to plaintiff's credibility, the ALJ noted that
[t]he claimant's allegation that his impairments, either singly or in combination, produce symptoms and limitations of a severity to prevent all sustained work activity is not credible. The claimant is able to live and function independently. No physician, treating or otherwise, has ever placed any specific long-term work restrictions upon the claimant's activities more restrictive than found in this hearing decision or expressed an opinion that the claimant is disabled. The claimant's daily activities appear to be limited largely as a matter of choice.
(Tr. 18-19.)
In support for his decision, the ALJ noted that plaintiff said he could stand only for thirty to forty-five minutes during the hearing, but told Dr. Clark he could stand for four to five hours. The ALJ also relied on the fact that plaintiff's subjective complaints are not supported by objective medical evidence, plaintiff required only conservative treatment, plaintiff is not prescribed medication for pain, and plaintiff does not need assistive devices. Moreover, the ALJ referenced plaintiff's work history as sporadic and low-earning. Plaintiff appeared tanned and "physically trim," and did not appear in any distress, at the hearing. With respect to medical treatment records, the ALJ remarked that
the claimant has normal gait with good range of motion of the joints and spine. Significant clinical signs typically associated with chronic pain have not been consistently present on physical examination. There is no objective evidence of muscle atrophy, bowel or bladder dysfunction, severe and persistent muscle spasms, neurological deficits (i.e., reflex, motor, or sensory loss), or inflammatory signs (heat, redness, swelling, etc.).
(Tr. 18-20.)
Based on SSA regulations, the ALJ determined plaintiff's past, relevant work is as a dump truck driver. The ALJ referenced the Dictionary of Occupational Titles (DOT), United States Department of Labor No. 902.683-010 (4th ed.1991), for "dump trucker." He determined the position, as generally performed in the national economy, is unskilled, medium exertional level, requiring no significant climbing, balancing, stooping, kneeling, crouching, or crawling. Based upon plaintiff's RFC, the ALJ determined he could return to his work as a dump truck driver; therefore, *857 he is not disabled within the meaning of the Act. (Tr. 20-21.)
The Appeals Council declined further review. Hence, the ALJ's decision became the final decision of the defendant Commissioner subject to judicial review. (Tr. 6-8.)
In his appeal to this court, plaintiff argues that the ALJ (1) improperly determined plaintiff had the RFC to return to his past relevant work, and (2) failed to use the Medical-Vocational Guideline (Grid) in reaching his decision.

II. DISCUSSION
A. General Legal Framework
The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir.2003). In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir.2003). So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.
To be entitled to benefits on account of disability, claimant must prove that he is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment, which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A) (2004). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920 (2003); see also Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir.2003). If the Commissioner can find that a claimant is or is not disabled at any step, a determination or decision is made and the next step is not reached. 20 C.F.R. § 404.1520(a)(4).
B. Plaintiff's Ability to Return to Past, Relevant Work
The RFC "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." S.S.R. 96-8p, 1996 WL 374184, at *3 (Soc. Sec. Admin. July 2, 1996). The determination of residual functional capacity is a medical issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.2000), which requires the consideration of supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.2001) "In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional." Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir.2003).
The ALJ must make explicit findings regarding the actual physical and mental demands of a claimant's past work and compare the actual demands of the past work with the claimant's RFC. See 20 C.F.R. §§ 404.1520(e) and 404.1560(b); Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir.1999); Ingram v. Chater, 107 F.3d 598, 604 (8th Cir.1997) (citing Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir.1991)).
Plaintiff argues that his description of his work as a dump truck driver differs *858 from the DOT definition the ALJ relied upon and, as such, the ALJ should have explicitly reconciled this apparent disparity in making his RFC determination. Plaintiff argues further that the ALJ's RFC determination is not supported by substantial evidence, because evidence in the record does not sustain plaintiff's ability to stand four to five hours a day. Lastly, plaintiff contends that his work as a dump truck driver is at the medium exertional level, and that the ALJ's RFC belies plaintiff's ability to engage in medium work.
Plaintiff relies on Social Security Ruling 82-62 and Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir.1991), in support of his argument that the ALJ failed to properly reconcile the difference in plaintiff's work history statement and the DOT description of his past work. In Groeper, the court commented on the application of Social Security Ruling 82-62. The court ruled that the ALJ must fully investigate the demands of the claimant's past relevant work, "make explicit findings as to the physical and mental demands" of his past, relevant work, and compare these findings with the claimant's capabilities, before deciding whether the claimant can perform the past, relevant work. Groeper, 932 F.2d at 1238 (internal quotations omitted). A conclusory statement that the claimant can perform the past work is insufficient; the ALJ must make the required findings. Id. at 1239.
In investigating the demands of plaintiff's past work, the ALJ is not required to limit his analysis to plaintiff's narrative description, but can evaluate it as it is done in the national economy. See Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir.2000) (citing Jones v. Chater, 86 F.3d 823, 826 (8th Cir.1996) ("Where the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled.")); Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir.1990) (quoting SSR 82-61, 1982 WL 31387, at *2 (Soc.Sec.Admin.1982) ("The claimant may also be found able to perform past relevant work if he retains the RFC to perform the `functional demands and job duties of the occupation as generally required by employers throughout the national economy.'")). Having relied on DOT listing 902.683-010 for the requirements of a dump truck driver as performed in the national economy, the ALJ was not required to reconcile plaintiff's description of his position with the DOT description, nor compare plaintiff's RFC with his own description. In this regard, the ALJ committed no error.
The court next turns to whether substantial evidence supports the ALJ's RFC determination; specifically, his assessment plaintiff retains the ability to stand or walk no more than five hours in a six hour work day.
With respect to medical records, the ALJ noted Dr. Clark's assessment that plaintiff reported he could stand for four to five hours, and that Dr. Clark determined plaintiff had no physical, functional limitations. He further referred to V.A. records indicating plaintiff had degenerative changes in the back, disc changes, and additional signs and symptoms as noted in the MRIs of record. The ALJ also detailed Dr. Ivins's assessment that plaintiff had mild range of motion limitation, and could stand at least two hours, but less than six, in an eight hour day. The ALJ placed great weight on Dr. Ivins's assessment, finding his determinations are supported by the record and plaintiff's treating physicians. He also accepted Dr. Clark's statement that plaintiff told her he could stand four to five hours, finding it *859 consistent with the record and Dr. Ivins's assessment.
Regarding plaintiff's credibility, the ALJ found plaintiff's reported limitations are not totally credible. In support for his position, the ALJ noted plaintiff is able to function independently, no physician has prescribed any significant long-term work or functional restriction greater than the ALJ's determination, no provider has ever found plaintiff disabled, plaintiff is not taking prescription pain medication, plaintiff did not appear in any distress at the hearing, and that plaintiff limits his own daily activities as a matter of choice. While plaintiff testified at the hearing that he can stand up to forty-five minutes, and that he did not recall telling Dr. Clark he could stand for four to five hours, the ALJ placed greater emphasis to the statement made during examination, seemingly disbelieving plaintiff's denial.
An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining a plaintiff's RFC. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir.2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record."); Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir.1995). Assessing a claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir.2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir.2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.").
The court finds no error in the ALJ's credibility determination. Plaintiff reports continuous, debilitating back pain preventing him from engaging in any employment and standing more than forty-five minutes at a time. Despite these allegations, plaintiff is not taking daily pain medication, but only Etodolac (a non-steroidal anti-inflammatory drug). Plaintiff received two pain injections, one in June 2003 and September 2003, after the disability hearing. There is no indication plaintiff received any injections prior to that time, that he took oral pain medication (except for a discrete period of time), that he requested pain medication and was denied, or that he had the inability to pay for medication or treatment (plaintiff receives care from the V.A.). Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir.2003) ("The failure to request pain medication is an appropriate consideration when assessing the credibility of a claimant's complaints of pain."); Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir.1996) (citing Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir.1994) ("[A] claimant's failure to take strong pain medication is `inconsistent with subjective complaints' of disabling pain.")).
Turning to the disability hearing, plaintiff testified that he cannot stand for more than forty-five minutes. When questioned about Dr. Clark's report that plaintiff said he could stand four to five hours, he replied "I  no. Not that I know. We left at the time. No." Moreover, plaintiff testified that he did not believe Dr. Clark had completed a thorough examination. The record shows that Dr. Clark completed a motor and neurological examination, and history. Her report consists of a narrative almost three full pages long, and discusses all the medical evidence of record to that point. The report is accompanied by two pages of range of motion values, encompassing examination of the shoulders, elbows, wrists, hips, cervical spine, and lumbar spine. The record reflects a thorough examination, belying plaintiff's statements at the hearing. See Ply v. Massanari, 251 F.3d 777, 779 (8th Cir.2001) (noting a *860 claimant's inconsistent statements as a factor to consider in determining claimant's credibility). Regarding plaintiff's demeanor during the hearing, the ALJ noted he appeared "physically trim," and did not appear in distress. Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir.2001) (in making credibility determination, ALJ may properly rely on personal observations of claimant's demeanor during hearing).
Moreover, in his claimant questionnaire, plaintiff reported the ability to engage in all "reasonable" household chores with no assistance, and that he leaves the house daily for shopping or physician appointments, only limited by his ability to sit for long periods of time. With respect to medical records, the ALJ noted that plaintiff's treating providers never declared him disabled, and never prescribed functional limitations, other than for short periods of time. Dr. Clark found no functional limitations, and Dr. Ivins found plaintiff could walk and stand at least two hours per day, but not as much as six hours per day. All these provider records, accompanied by plaintiff's ability to engage in activities of daily activity and lack of regular pain medication, are inconsistent with his reported limitations See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir.1997) ("The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence.").
Viewing all the evidence in toto, the court concludes the ALJ's determination that plaintiff could walk or stand no more than five hours is supported by substantial evidence. The ALJ expressly determined plaintiff lacked credibility, and standing or walking up to five hours is not inconsistent with Dr. Clark's opinion plaintiff was not limited, her report that plaintiff told her he could walk four to five hours, and Dr. Ivins's assessment that plaintiff could stand and walk at least two hours in an eight hour day, but not as much as six hours. The ALJ's determination does not contradict any of these assessments, and nothing else in the record detracts from his decision. Notably, plaintiff was free to provide evaluator supporting his contention that he is unable to walk or stand for an extended period of time; he failed to do so. See 20 C.F.R. § 404.1512(c) ("Your responsibility.... You must provide evidence showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your case."); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir.2004) ("A disability claimant has the burden to establish [his] RFC.").
While the ALJ's findings regarding plaintiff's RFC are supported by substantial evidence, the court finds the ALJ failed to make adequate findings with respect to the standing and walking requirements for plaintiff's past, relevant work. The DOT listing for dump trucker driver does not specify the requirements for walking, standing, or sitting. See DOT 902.683-010. It is classified as work at the medium exertional level, and the ALJ recognized such in his opinion. "The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds." SSR 83-10, 1983 WL 31251, at *6 (Soc.Sec.Admin.1983); see 20 C.F.R. § 404.1567(c).
In his opinion, the ALJ stated "that the job of dump truck driver is performed in a seated position and would not require standing or walking more than five hours *861 in a normal workday[,]" but offers no indication on what basis he forms this opinion. Moreover, the record itself provides no support for this contention. As the aforementioned suggests, the DOT listing fails to detail any standing, or walking requirements beyond referencing medium work, which requires the capacity to stand or walk six hours in an eight hour day.
Reviewing plaintiff's description, he states the position, as he performed it, required him to walk and stand eight hours in an eight hour day. Additionally, plaintiff reported he sat, climbed, stooped, kneeled, crouched, crawled, handled and grasped, and wrote, typed or handled small objects eight hours in an eight hour day. Clearly, plaintiff did not accurately complete this work history report, as he could not have engaged in each of these separate activities for eight hours in an eight hour day. Defendant argues that plaintiff may have intended to convey that during an eight hour work period he was called on to perform each of these activities and, if such was his intention, the decision of the ALJ was proper.
It is not, however, the province of this court to re-weigh the evidence, or to make an initial determination as to plaintiff's intent; the ALJ is in the best position to clarify the record. Cf. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir.2004) ("Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."); Spradling v. Chater, 126 F.3d 1072, 1074 (8th Cir.1997) ("The inconclusive evidence concerning [Plaintiff's] functional limitations is best resolved by the ALJ.").
A thorough review of the record reveals no evidence, substantial or otherwise, supporting the ALJ's conclusion that plaintiff will not be required to stand or walk more than five hours in the work day. Moreover, the position is characterized as medium work requiring the ability to stand or walk six hours in an eight hour day, seemingly belying the ALJ's conclusion that plaintiff can perform this position in the national economy, but retains the RFC to stand or walk no more than five hours in a six hour workday. The ALJ is free to make findings that the past, relevant work, as plaintiff performed it, was not in the medium exertional level. See Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir.1990) (decision that claimant could return to his past relevant work was supported by substantial evidence even though claimant's past job required light exertion while he was now capable of only sedentary work, in light of evidence that the relevant job can vary in exertional capacity from light to sedentary). As noted, this case is devoid of such findings.
Vocational testimony, while not required at Step Four of the sequential evaluation process, may have assisted the ALJ in forming the basis for his determination. Miles v. Barnhart, 374 F.3d 694, 700 (8th Cir.2004); Lewis v. Barnhart, 353 F.3d 642, 648 (8th Cir.2003) ("Vocational expert testimony is not required at step four where the claimant retains the burden of proving she cannot perform her prior work."); Banks v. Massanari, 258 F.3d 820, 827 (8th Cir.2001) ("[I]t is clear in our circuit that vocational expert testimony is not required at step four where the claimant retains the burden of proving she cannot perform her prior work. Vocational expert testimony is not required until step five when the burden shifts to the Commissioner...."). Precedent and SSA regulations demand the ALJ support his conclusion with some testimony or evidence that plaintiff's past, relevant work as a dump truck driver will not require standing or walking more than that detailed in his RFC. In this regard, the ALJ failed to cite evidence buttressing his conclusion, and the court finds no such evidence of *862 record supporting this conclusion. Accordingly, the ALJ erred.
C. The Grid
The Grid is a medical-vocational guideline detailing "fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir.1998) (quoting Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir.1997)); Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir.2001). It is the plaintiff's burden to establish he cannot engage in past, relevant work. Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir.1993) ("In order to establish a disability claim, the initial burden of proof is on the claimant to show that [he] is unable to perform her past relevant work."). If he fails to meet that burden, and the ALJ determines he "cannot return to his past relevant work, the burden of proof shifts to the Secretary who then has the duty to show that the claimant is not disabled within the meaning of the Act." Fenton v. Apfel, 149 F.3d 907, 910 (8th Cir.1998); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir.2004).
In this instance, SSA regulations detail the use of the Grid.
The Medical-Vocational Guideline rules reflect the major functional and vocational patterns which are encountered in cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevents the performance of his or her vocationally relevant past work.
>20 CFR Pt. 404, Subpt. P, App. 2, § 200.00 (emphasis added).
Plaintiff's argument that the ALJ was required to consult the Grids and determine plaintiff was disabled based on the Grid, is misguided. Section 202.00(c) states that a claimant of advanced age, with unskilled work experience, who is limited to light work, and "can no longer perform vocationally relevant past work," is deemed disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c). The ALJ, per SSA regulations, is not required to consult the Grid unless he determines plaintiff cannot return to his past, relevant work, and moves to Step Five of the sequential evaluation process to determine if he can engage in other jobs in the national economy. See 20 C.F.R. §§ 404.1520, 416.920; 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00; see also Martin, 901 F.2d at 653 ("Whether it is proper for the ALJ to use the medical-vocational guidelines ... is applicable at step five of the evaluation. This occurs only subsequent to a determination that the claimant is not capable of performing his past relevant work at step four."). Because the ALJ never considered Step Five, he was not required to rely on the Grid. On remand, should the ALJ determine plaintiff does not retain the RFC to return to his past, relevant work, then reference to the Grid is proper.
For these reasons, the final decision of the Commissioner is reversed and remanded in accordance with this Memorandum.
An appropriate order shall issue herewith.

ORDER
In accordance with the Memorandum filed herewith,
IT IS HEREBY ORDERED that the decision of the defendant Commissioner of Social Security is reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g). On remand, the ALJ will make specific, evidentiary findings as to the standing and walking requirements for a "dump trucker" *863 DOT 902.683-010. The ALJ will then compare plaintiff's residual functional capacity in light of his findings to determine if he can engage in past, relevant work. If the ALJ finds he cannot, than the ALJ will evaluate plaintiff's ability to engage in other work in the national economy, per Step Five of the sequential evaluation process 20 C.F.R. §§ 404.1520, 416.920.
NOTES
[1] The name of the treatment provider at these visits is illegible.
[2] Syncope is "[a] fainting or swooning; a sudden fall of blood pressure or failure of the cardiac systole, resulting in cerebral anemia and subsequent loss of consciousness." Stedman's Medical Dictionary, 1251 (25th ed.1990).
[3] Flexeril "is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions." Physician's Desk Reference (PDR), 1929 (55th ed.2001).
[4] Percocet "is indicated for the relief of moderate to moderately severe pain." PDR, at 1211.
[5] Dr. Hopkins's first name and designation (D.O. or M.D.) is unknown.
[6] "Ibuprofen is used to relieve the pain, tenderness, inflammation (swelling), and stiffness caused by arthritis and gout. It is also used to reduce fever and to relieve headaches, muscle aches, menstrual pain, aches and pains from the common cold, backache, and pain after surgery or dental work." Medline Plus at http://www.nlm.nih.gov/me dlineplus/druginfo/medmaster/a682159.html (last visited February 11, 2005).
[7] "Oxycodone is used to relieve moderate to moderate-to-severe pain." Id. at http://ww w.nlm.nih.gov/medlineplus/druginfo/medmaster/a682132.html (last visited February 11, 2005).
[8] "Naproxen as Naprosyn ... [is] indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis and juvenile arthritis." "Naproxen is a nonsteroidal anti-inflammatory drug (NSAID) ...." PDR, at 2744-45.
[9] "Sulindac is used to relieve the pain, tenderness, inflammation (swelling), and stiffness caused by gout, arthritis, and other inflammatory conditions." Medline Plus, at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681037.html (last visited February 11, 2005). Sulindac is a non-steroidal anti-inflammatory medication (NSAID). Id. at http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202743.html (last visited February 11, 2005).
[10] Ranitidine HCL, otherwise known as Zantac, is indicated for the treatment of gastrointestinal disorders. PDR, at 1496.
[11] "Etodolac is used to relieve the pain, tenderness, inflammation (swelling), and stiffness caused by osteoarthritis and rheumatoid arthritis. Etodolac is in a class of medications called nonsteroidal anti-inflammatory medications (NSAIDs)." Medline Plus at http://www.nlm. ni h.gov/medlineplus/druginfo/medmaster/a692015.html (last visited February 11, 2005).
[12] "Toradol is indicated for the short term ... management of moderately severe acute pain that requires analgesia at the opioid level, usually in a postoperative setting." PDR, at 2790.
[13] Lidocaine "causes numbness or loss of feeling in an area of your body." Health Digest at http://www.healthdigest.org/ LIDOCAINE-(Injection)-(Injectable)_4453_PRO.php (last visited February 11, 2005).
[14] Simvastatin, commonly know as Zocor, is a lipid-altering agent used to treat problems with cholesterol. PDR, at 2056.